Good morning, Your Honor and members of the panel. My name is Carl Verdi. I'm representing Oliver C. His mother, Nicole, is here in attendance with us today. You've met her prior to our proceedings. I'd like to reserve, if I may, two of my minutes for rebuttal, and will now proceed with my argument. This is a case in which we are not asking this panel to change the law, and I want to be really clear about that. We're not asking for any ruling that would disturb any of the existing law regarding placement in this circuit, and particularly, we're not asking the Court to reconsider the rulings of Rachel H. or the other case that followed the Andrew F. case decided by the Supreme Court, which was the MC case v. Antelope Valley, both of which discussed the issue of location as a consideration in placement. I will not spend a lot of time reviewing Oliver's what would, I think, fairly be characterized as dramatic medical history, or his parents' heroic efforts to keep him moving forward, developing, and frankly, alive, I think. Can I ask you an extreme hypothetical? Of course, Your Honor. Suppose that the parents had decided to move to Maui. Would your position be that the Honolulu School District would have to incur the transportation costs of transporting him every day by air from Maui to Honolulu and back? Well, I think that it's an incomplete hypothetical, Your Honor, insofar as the question, the first question would be, is there no place on Maui that could provide the services? Okay, then let's assume for purposes of my extreme hypothetical that Maui has the same medical facilities that the Castle Medical Center could afford on the windward side of the island. I think the solution there is, it's not a false, I think the dyadic there is a false choice. I think what has to happen there is the DOE is obligated to develop in its backyard there, the Hawaiian word for that is kuleana, its own resources to serve such children. And I'll give you a prime example of that. But the Administrative Law Judge found that this was not a change in the program under the IEP. It was simply a change in the location, and our cases seem to recognize that distinction. I'd like to just follow on the first hypothetical, if I may, and tell the Court that when Hawaii was under federal consent decree, which was in the period of, I believe, 1992 through 2001-2002, there actually were programs developed on Maui for that specific reason, because there was no day treatment center on Maui for children with severe autism. Those resources were developed locally, and that's what I would expect would happen in the Maui example you gave. The same thing, does it need to happen? The reason I obviously closed the hypothetical is that the ALJ seemed to be heavily influenced by the fact that the parents voluntarily chose to move to Kaneohe and sort of precipitated the entire controversy here. I understand that that seems like neutral language, but actually it's quite pejorative. And I think the District Court Judge used it as well, that the parents chose to move. But they did, didn't they? Well, the parents were— And they told the school district in August that we're leaving. The parents were finally able, who are not people of means, to scrape together a down payment on a condominium in Kaneohe. But I mean, the fact is that they did move. I mean, the school district didn't say, if you want the services that your child needs, you're going to have to move to the other side of the island, because that's the only place where we can provide those services. Right. Well, let's just follow on with that then. Let's say that the parents had stayed in the Honolulu District and had stayed at Kuhio. Would any of the panel members disagree with the following propositions? Cutting off Oliver's ASL services would be a denial of faith. Interfering or cutting off Oliver's nursing care would be a denial of faith. Taking Oliver out of the small classroom with 14 students who are typically developing, because even though Oliver has downs, he's at average or above in terms of his cognitive abilities, but that, too, would be a denial of faith, because part of his . . . But if they hadn't moved, none of that would have happened. The fact that they did move does not mean it has to happen, because we have, as the court may not be aware, although we're talking about districts here, those districts are fictional. They are districts of convenience. The state of Hawaii has a single unified school district. So the fact that the accounting is spread out through various district offices is simply a matter of convenience. It's not a matter of fact or . . . It's not a matter of law. It's an illegal distinction. So it's not . . . Now you're just . . . It seems to me the statute is a person of school age shall be required to attend the school of the service area as determined by the department in which the person resides. So if we take that back to service area, I think Judge Tallman's question again makes a lot of sense, because now we're not talking about districts and maybe . . . Judge Tallman's from Idaho, so he's talking about school districts over there, but what we're talking about is service area here. So let's go back to his question. Let's not call it a district. Let's call it a service area. So going back to the question, Your Honor, the answer is this. Hawaii has exempted students who are exceptional from the service area requirement. That is the one thing we prevailed on below before Judge Kobayashi, in which she said that the language in the regulations means what it says, exceptional students are not bound by the geographic limitations and do not need to obtain a geographic exception in order to attend the school of their choice. That ruling . . . Then what did she say? Pardon me, Your Honor? Then what did she say, the good judge? Well, she said this was not a change of placement because it was not a change of program. Even though she said all that stuff, looking at the same thing, she said this hearing officer should nonetheless be affirmed. I understand that, Your Honor. I was addressing your question. Well, all I'm trying to do is I'm trying to get you back to the hypothetical he's giving. These parents determined they were going to move. They did move into a different service area rather than district. And when they moved to this service area, then the ALJ had to determine whether that child was going to get the same type of education that they were getting in the other service area. That's what this case is about. It's a question of whether or not the services were comparable on both sides. You can only get to that question if you ignore what the regulation says, Your Honor, and if you ignore what Judge Kobayashi said about that regulation. Well, Judge Kobayashi knew exactly what she was saying, and she didn't think there was any problem thereafter. No. What she thought . . . That's all I'm trying to say. Respectfully, Your Honor, I beg to differ. What Judge Kobayashi disagreed was not in the idea that the child must attend the school in the service area. She did not say that anywhere. She said exactly the opposite. Well, but what she did say . . . What she did say was that this . . . she did not consider this change a change in program and, therefore, placement did not change. Because the services were found by the ALJ to be comparable to the services. They were not identical, but as a matter of fact, they were comparable. Well, Your Honor, respectfully, where is that in the record? Throughout the record, we've heard an ALJ say that and we've heard Judge Kobayashi say that on the mere representation that someday those services might be in place. And let me tell you what those services would be. Isn't that inherently a factual determination? I mean, we obviously can overturn it, but don't we have to give substantial deference to the fact that the ALJ conducted a multi-day evidentiary hearing and, what was significant to me, entered an adverse credibility finding with respect to the testimony of the parent? Well, not as to the totality of the parent's credibility, Your Honor. Now you're arguing . . . Let's talk about . . . Now you're arguing facts and . . . No, no, no. I want to talk about the standard of review because I think that that's . . . I am talking about the standard of review. Well, the standard of review is de novo. I can't retry. I can't retry this hearing. No, no. The standard of review here is a mixed question of law and fact that under Gregory K. v. Longview School District, this court has said is de novo review and . . . Well, it's de novo review for the application of the law applicable, but we're not going to be changing the facts unless there's clear error. Well, what Gregory K. says is the court will review the appropriateness of a special education placement de novo, and that's what we're talking about here. I think the key . . . Isn't that an inherently fact-driven inquiry? Because the court . . . the administrative law judge heard a lot of testimony from all of the witnesses about what types of supportive services would be available in the new location, and that drove the, I guess, legal determination, if you want to call it that, that the services were comparable. Okay. So the day the services were to end, the parents . . . at Cogeo, the parents were first notified. There was no nurse identified. There was no one-to-one identified. I thought you had been made, at least temporarily, very temporarily, to move one or two . . . No, no. Ms. St. John could not move because she had supplementary . . . Ms. St. John was the nurse. She's moving to another student, and Ms. Murray, Chastity Murray, was not going to follow Oliver to the other school. The uncontroverted testimony there from Ms. St. John, a registered nurse was, and Oliver's ASL interpreter, it would take two months to train staff so that Oliver could make an adequate transition and not regress. Now, what the school district is saying is that we don't care about that. We don't care about the fact that Oliver may regress, even though IDEA says you can't put a child in circumstances where they will regress, otherwise that's a denial of faith. You just have to take your chances, parents. The ALJ was also influenced, as I read the record, by the fact that he was going to be subjected to a two-hour bus ride each way, and that there . . . and that put him at risk should he suffer an emergency in Ruth. She substituted her judgment for the direct testimony of Ms. St. John, cited in our brief, who said that the bus ride was useful to Oliver because he could rest. If you look at the video that was . . . But if he goes into some sort of, I don't know what the medical term is, cardiac arrest or whatever it might be, and he's stuck in the tunnel on the polyhighway, isn't that an increased risk of injury or death to Oliver because of the geographical location that he has? It's actually worse for him to be reliant on CASEL, and I will tell you that since the hearing, there's been an incident where Oliver has been . . . he has a pulse oximeter, and his pulse . . . his blood oxygen level dropped below 90, and his parents could not raise it. When they took him to CASEL to try and get treatment there, CASEL didn't have the appropriate pediatric equipment, and they had to rush through that tunnel that you're mentioning over to didn't need to be resuscitated yet again. Every single medical care provider who's treated Oliver is either at Kapi'olani or on this side and has . . . all of them have recommended to a person that he remain where he is. You cannot punish the parents or Oliver because he moved, especially given the fact that in this state, we have a regulation that says he can receive services at any school, and that, as I said, is the one thing that Judge Kobayashi upheld. Is your answer to my extreme hypothetical then that the school district would have had to incur the cost had the parents decided to move him to Maui? The answer to the question is the school district would have to find some way of providing the same level of services that he needs to advance, because we're not . . . I would just ask . . . . . . that he really needs to be sort of tethered to the children's hospital, because that's the only medical center that can adequately address all of the maladies that afflict him. This is so, Your Honor. He spent six of his first eight months in that children's hospital. So why did the parents want to move away from . . . They did not. . . . the source of . . . They couldn't afford something on this side. Windward side properties are affordable. Frankly, I will represent to the court that they've informed me they're moving back here for this very reason, because they're too far from medical care. After the incident in December . . . If that happens, does that move this case? This case is not moved for this reason, because the district court below rationally concluded that there is absolutely no requirement that Oliver apply for a geographic exception, and the DOE is invoking of that or asserting, as Judge Smith was questioning me, that geographic boundary defines the school. It doesn't for Oliver or any other exceptional student, which are gifted students or students like Oliver with extreme challenges. That's why we're not mooted out here. We are here with a very live issue, and this is a direct follow-on to the Rachel H. case. . . In making this determination, what significance do I give to the hearing officer's questioning of the parents' credence? I don't think she said anything about the . . . She did not identify any specific instance of parental testimony on . . . I agree, but she did absolutely suggest that she was questioning whether the parents were credible. She did that gratuitously and without factual . . . Do I give significance to this? That was my question. You do not, Your Honor. You could if the standard . . . It's a sliding scale. If she had made specific findings and said, I find the parents' testimony not credible because they exaggerated, they lied, they fabricated, they did X, Y, Z, they misrepresented their relationship with Ms. St. John or the one-to-one or whatever. None of that is in the record. That kind of fix-it-all goo is the wrong kind of tool to be using. I'm sorry. There are references in the record to comments that I believe the mother disavowed about her real objections to placing him . . . This is a very ugly allegation. We don't have to get into that. That was a specific instance that the ALJ cited that seems to me to bolster the ALJ's conclusion that she was, I don't know if embellishing is the right word, but wasn't totally credible. No. You're right. The ALJ . . . Excuse me. I blurted out no for whatever reason. What I'm trying to say to myself is to tell you this. The fact is that there's an allegation by Ms. Reedy that Nicole, who's here today, said she doesn't want Oliver to be in school with poor people, which she expressly denied on the stand. Just for the court's edification, and this is of record, Nicole spends her life serving poor people. She is a social worker who, at the time, was working at Catholic Charities, who now is a domestic abuse advocate working for the Navy, the joint . . . Counsel, I mean . . . So . . . . . . whoever you hear has to give a fair amount of deference to the finder of facts determination in the face of conflicting testimony from two witnesses as to which witness to credit. Okay. So . . . And you're asking me to retry the case. And I don't think I can do that, Oliver. What we're asking you to do is look at . . . The Rachel H. case, page 1092, sets it all out in fine detail. The knowledge of a particular classroom or teacher may well be relevant to allowing parents to participate in making . . . meaningfully in the IEP process. That was totally lacking here. Bev Reedy called these parents at the last day of . . . Oh, by the way, I've decided it's going to be Ben Parker. See you in ten days when the intersession is over. No introduction to staff. Oliver in particular . . . And I invite you to look at that video, Judge Tolman. You'll see a little boy with his fourteen peers, and they're cheering him on with his custom walker. You know, that's an environment where he went from bear crawling to walking, where he went from refusing to speak to using ASL and actually, although he can't speak and won't be able to until his trach is taken out, attempting to verbalize so his peers and teachers could understand him. That's what we're talking about here in terms of meaningful participation. Where were those opportunities outlined? In the record. The ALJ can say whatever she wants, but if it's not in the record, it doesn't count. The final thing I'd like to say is what this court said in Rachel H. is extremely important to your decision making here. You said, this doesn't mean the school districts have carte blanche to assign a child to a school that cannot satisfy the IEP's requirements, nor does it mean that not identifying a school can never result in a denial of faith, etc. What this court is saying very clearly and what it said in the MC case is location is never going to be a per se violation. We are not going to let parents say, oh, you didn't name the school so you get to run off and ask for private services. Certainly this is nowhere near that case. The parents are only asking for a continuation of an existing program and no additional expense to the DOE. What Rachel H. stands for is the proposition that you have to look at the totality. I understand very well, Judge Tallman, what you're saying about not retrying the case. My response to that is, if the facts are not there, this court must exercise its authority on a de novo basis because of what we're talking about here and say, this doesn't work. Well, you're confusing different standards of review. What we would have to find is that the record, that the fact finder clearly erred based on the record in making that factual determination. That's not a de novo review. As to such things as the credibility determination, I agree respectfully on the issue of whether or not there was a change of placement. That is clearly a mixed question and de novo review would apply to that question. Once the facts are established. Yes, exactly. Got you. I'm sorry I've gone over time. I really appreciate the court's questions and I'll stand down now. Thank you, Mr. Verity. Ms. Murakami? Good morning, your honors. Deputy Attorney General Chris Murakami on behalf of APELI, the Department of Education. This case is an appeal from the district court that affirmed the administrative hearing officer's decision. There are two main issues here. First, whether students' placement for the 2016-17 school year in students' IEP was a quote, regular education setting on a department campus or whether it was Cujillo Elementary School. And second, whether appellants were entitled or not entitled to stay put relief as requested because the preschool program at Ben Parker was in a general education classroom on a department campus, which was substantively similar and comparable to the preschool program in Cujillo and therefore was not a change in placement but a change in location. The two applicable laws that we should adhere to are found in 20 U.S.C. section 1415J and also the companion Hawaii Administrative Rules section 8-60-72A under the definition of stay put. In particular, regarding the relevant portions of stay put, it states, quote, that during the pendency of any proceeding conducted pursuant to this section, unless the state and local education agency and the parents otherwise agree, the child shall remain in the then current placement of the child. Now, for some guidance with respect to what is defined as placement of the child during the stay put proceedings, I would refer to the LM case that Judge Talman, you're very familiar with, I'm certain, as you had authored that opinion. And in that particular case, your honor stated that the phrase current educational placement is typically the placement described in the child's most recently implemented IEP. In the child's most recently implemented IEP, there was no school specifically mentioned, right? That is correct. There was no location specifically mentioned, is that right? That is correct. So if that's so, and given now your reading of the statute, can I suggest this, that as the service area in which Oliver resides, in which Oliver was placed, or was a regular education setting on a DOE campus that could meet Oliver's IEP requirements, then no stay put order should be issued, is that true? Well, in this particular case, that is correct, because of the fact that the placement did not change. There was no change in placement, and therefore, for the purpose of stay put, it did not apply. So we're really focusing in then on, your word is placement. That is correct. And so I get at the next landmark case in this circuit, which is ND versus the state of Hawaii. And that is the controlling circuit precedent on the definition of placement. Now, in April of 2010, the Ninth Circuit in ND versus State of Hawaii versus the Department of Education held that educational placement means the general education program of the student. Educational placement refers to the type of educational setting that a student is in. For example, a regular education classroom, a fully self-contained special education classroom, or a residential program. A change in educational placement relates to whether the student is moved from one type of program. For example, a regular classroom or regular education classroom to, let's say, home instruction or a residential placement. In that case, there would be a significant change in the, quote, student's program. The ruling in ND, yes? So are we suggesting then that Oliver must be put, because he was in a regular educational setting, that he has to go to another regular educational setting? Is that what you're suggesting? What I'm suggesting is that placement did not change per his IEP that's identified in the prior written notice. And I guess that's what I'm getting at. So you're saying the placement did not change. So determining whether the placement did not change is pretty important. And the ALJ made that determination, right? That is correct. And what deference do I owe him or her? Well, Ms. Somerville, if you read her very lengthy and detailed decision, we would argue was extremely thorough and careful. And in that particular, for that reason, this court should give substantial weight that the district court gave it. It wasn't as though the hearings officer, well, first of all, on the issue, yes? Did the IEP include provision of nursing and ASL services? Yes, it did. And was Ben Parker prepared to provide ASL and nursing services? Yes, it was. It's going to be a transition, obviously, with different personnel. That is correct, Jed Bybee. If I may interject, the Department of Education, first the Honolulu District, when they became aware that the family was moving, they immediately contacted the Windward School District to set up and arrange for a transition to take place. Now, this is not the type of plan, transition plan that took place in this particular instance was unique. Routinely and regularly, when a family moves outside of the service area and enrolls the in that new service area. However, in this case, knowing, number one, the very complex medical needs of this child and also allowing for there to be a transition period of time, the Honolulu District actually gave one month, not one day, not one week, but a whole month of transition services to continue so that the family could get accustomed and acclimated into their new service area and that there would be then an ease of transition with respect to the servicing of this child. Would the move have prevented Oliver from completing any of his mobility objectives? Your Honor, we would say no. Everything, well, number one, all the services and related services as well as the supplementary aids and supports would be afforded and fully implemented to Oliver at his new home school. Nothing would have changed. The only thing that would change would, of course, as was clearly mentioned, the preschool program at Ben Parker would be the Head Start program as compared to the program that was affiliated with Kuhio Elementary School, which was, I believe, a sort of cooperative between the school and the University of Hawaii. But back to my question, preventing him from completing any of his mobility objectives? I mean, the IEP talked about mobility objectives. Yes. So, Judge Smith, no, all his objectives and his goals and all the concerns, my understanding is that up until the most recent IEP, there were new objectives and goals that were developed. There would be no change in the assistance by the Department of Education to provide Oliver with the opportunity to succeed in the same way that he did at Kuhio Elementary School. Being able to walk as needed? Absolutely. Climb and descend the stairs as needed? Absolutely, and in fact, in this particular case, that was one of the reasons why Ben had the opportunity to experience his chances for mobility, his opportunity. There was another school, potentially, it wasn't in the general vicinity of the family, it was in the Kailua area, but one of the factors that was mentioned was the fact that that school didn't have the kind of stairs that the school thought would be more appropriate to continue with Oliver's progressing in his mobility. Now, when Oliver first arrived at Kuhio Elementary School, he was not able to walk, and he did make progress over time. And likewise, at Ben Parker, it is our position that he would continue to make the progress because, number one, his IEP would have been fully implemented. There was no change in the servicing. There was no change in the fact that he would have the same type of advantages and experience to interact with typically developing peers. It's my understanding that the nurse, that there was a nurse that he had, and that this nurse was agreed to transition with him and give one-on-one assistance, if you will, to another nurse, train alongside of that nurse for a week. That was adequate? The nurse, if I may interject, what was elicited in that nurse's testimony in hearing was that that particular nurse actually had taken another job outside of the contracted agency. And therefore, she herself was not going to be able to continue providing the services under that contracted agency. However, her supervisor of that contracted agency would still be one and the same. So it was the Department of Education's position that the supervisor who knew the condition and the complexities of Oliver would then, in turn, be able to assist the new nurse that would be assisting Oliver throughout the whole school day. I thought the problem was that the nurse was able to communicate with him through what I'll call a form, his form of ASL, which apparently had some idiosyncrasies that were different from standard ASL, if I can use that term. So, if I may, in this particular situation, during the transitional period of time, the Windward District Office actually had all the staff that would be working with Oliver C. trained in ASL, as well as looking at the, I guess, modified sign. So that was another, I think, particular, I think, in anticipation of Oliver coming to school, the school wanted to make sure that they were able to effectively communicate. And so during that period of time of that one-month period, the personnel that would be working with Oliver had received training in ASL. Is Oliver still being homeschooled, or did he ultimately enroll in Bend Park? I realize that's outside of the record. I believe, well, first of all, his home school is actually He'eia Elementary School. That was the school that was in their closest in proximity to his home. At the time when they moved to He'eia, there was no opening in the general education preschool program at He'eia. He never enrolled in Bend Park or at any time? He never physically? No, that's correct. He never set foot at Bend Park. My understanding, however, is that there were subsequent meetings at He'eia Elementary School. And I believe at a subsequent juncture, there were openings available in the general education preschool setting. Where the parents are now living. That is correct. And so that was another factor that was taken into consideration. As your honors did point out, the travel time from Kaneohe to Kuhio Elementary would be two hours one way. And it's, first of all, there is a concern regarding his safety. But also, and more importantly, it was clear that if a student would be missing two hours one way, that would really cut into his instructional period substantially. And the only way to avoid that was to have him move during non-commute hours, which would cut into the amount of time he would have available. That is correct. Because see, what happened in this particular case, even during the transition period of time, the bus service empathized with Oliver's condition. And they made special arrangements. So that he could take the bus at a different time than what would happen in the event, like if he were required to remain at Kuhio. He would then be on the regular bus schedule. If your honors don't, if there are no further questions, then I would ask respectfully that you find that the administrative hearings officer's decision was thorough and careful. The district court gave appropriate substantial weight because the decision evinces the AHO's careful, impartial consideration of all the evidence and demonstrates her sensitivity to the complexity of the issues. Therefore, we ask that this court affirm the district court's October 26, 2017 order. Thank you for this opportunity to present our case. Thank you, Ms. Murakami. Mr. Verity, we took you well over your time, but I will afford you some time for rebuttal. Thank you very much. I appreciate it. Thank you for the rebuttal opportunity and the rebuttal time. I'd like to turn to Judge Smith and answer a question that you didn't, I think, get a direct answer to, and that was how the change would affect the IEP objective and goal of Oliver's Mobility. The direct answer to that is found, among other places in the record, in the answering brief of the department in which they confirm that Nicole, Oliver's mother, was told by Ms. Reedy that if he was unable to walk over the larger Ben Parker campus that was hilly and undulating as compared to the small Cujillo campus, he could ride in a wheelchair or a wagon. Now, obviously, this presents tremendous risks for a child who has just gone from bear crawling on all fours to finally using the little walker that he has made for him, and for the DOE to say, we'll just put him back in a wagon, which is how he rode when he was an infant, is an obvious denial of faith. That's why I asked the question. But I thought that the district's position was that he could move on his own mobility until he got tired because the distances were longer to traverse, and when that occurred, there would be a wheelchair or a wagon in order that he could rest. Wasn't that the record? The record is that Oliver is still resistant to walking. That's the primary problem right now. And as soon as he gets tired, in Ms. St. John's testimony, which I've outlined in the opening brief, speaks to this. He, for all the difficulties he's been through, he is a tremendous fighter. And he fights for what he wants. And when he doesn't feel like walking, he fights the walker. They finally were getting him to use the walker at the small campus because he doesn't tire. What happens when he tires is he goes back to bear crawling or scooting, where he'll sit and push himself, even now. And as the record reflects, Dr. Burkhalter and all the other orthopedists discuss, and the testimony is uncontroverted on this, why he has to walk for his hip strength and his hip joints to develop. So is it your argument that if he knew that there was a wheelchair or a wagon right behind him, that he would just give up? And that's exactly true when we're talking about a crew that do not know him. The uncontroverted testimony of Oliver's father and his mother was that when they asked Ms. Reedy who are the folks who are going to be working with him, who is going to do the SL, who's going to suction him 4 times an hour, who's going to make sure he's not bear crawling or scooting and using that walker? She said, she referred him to Ms. Malehue, whom they'd never met and who had never met Oliver. Okay, that's the risk these parents are being asked to take. Now, the other question that Judge Smith asked that I thought was very cogent... Counsel, you are now well over your time, so I'll allow you to answer the question to Judge Smith, but you need to wrap up. Thank you, Judge Bybee. I truly appreciate the additional time. The other question Judge Smith asked was, as long as the school in the service area could provide a setting in regular education that could meet Oliver's IEP requirements, would that be okay? I don't think we're arguing about that. Well, you're not challenging the IEP at this point, right? No. We're solely focusing on whether or not... Implementation, implementation, implementation, exactly. That's what I wanted to make sure. That's exactly right. The sufficiency of the IEP is not at issue. I want to thank the panel for its attention and great questions this morning. This is an important case for the entire state. Thank you very much. Absolutely. Thank you very much for recognizing that. Thank you. We thank counsel for the argument. With that, we have concluded the oral argument calendar for the day, and the court stands adjourned.
judges: Tallman, Bybee, N.R. Smith